## SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHEVRON CORPORATION,

                Petitioner,                 CIVIL NO.  10-MC-21JH/LFG

To Issue Subpoenas For the
Taking of Depositions and the
Production of Documents.

Consolidated with

In Re Application of
RODRIGO PEREZ PALLARES,
an Ecuadorian citizen, and
RICARDO REBS VEGA,
an American citizen,

                Petitioners.              CIVIL NO.  10-MC-22 J/LFG

for an Order to Conduct Discovery
for Use in Foreign Proceedings.

## MEMORANDUM OPINION AND ORDER
## REJECTING CLAIMS OF ATTORNEY-CLIENT PRIVILEGE
## AND ORDERING PRODUCTION OF DOCUMENTS[1]

THIS MATTER is before the Court following an *in camera* inspection of various documents

submitted by Respondents, as to which attorney-client privilege is asserted.

### The Attorney-Client Privilege

The purpose of the attorney-client privilege is "to preserve *confidential communications*

between attorney and client."  In re Grand Jury Subpoenas (Anderson), 906 F.2d 1485, 1492 (10th

---

[1]This order is filed under seal pending resolution of Respondents' objections to the
Magistrate Judge's earlier order of production.

Cir. 1990) (emphasis in original).

> The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client . . . . The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out . . . . [T]he purpose of the privilege . . . [is] to encourage clients to make full disclosure to their attorneys.

Upjohn Co. v. United States, 449 U.S. 383, 389 (1981) (internal citations and punctuation omitted).

While the attorney-client privilege is important, it is not without limits. The party seeking to assert the privilege has the burden of establishing its applicability, and the privilege is to be strictly construed. Motley v. Marathon Oil Co., 71 F.3d 1547, 1550 (10th Cir. 1995); In re Foster, 188 F.3d 1259, 1264 (10th Cir. 1999). The mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege; rather, the communication between a lawyer and client must relate to legal advice or strategy sought by the client. United States v. Johnston, 146 F.3d 785, 794 (10th Cir. 1998).

As discussed at greater length below, the privilege does not protect communications between an attorney and third parties, including experts and technical advisors. It does not protect against disclosure of facts, even when those facts have been communicated between an attorney and a client. Upjohn Co. v. United States, *supra*, at 395-96. Nor does it foreclose consideration and inquiry into the general nature of a lawyer's activities on behalf of a client, or the conditions of a lawyer's employment, including any facts surrounding the lawyer's retention. *See*, In re Grand Jury Subpoenas (Anderson), *supra*, at 1492 ("fee arrangements are not protected by the attorney-client

privilege").

Rather, the privilege deals only with confidential communications, not with the framework in which the communications are spoken; thus, the attorney-client privilege does not bar discovery of the fact of representation, the terms and conditions of an attorney's employment, the purpose for which an attorney has been engaged, the steps which an attorney took or intended to take in discharging his obligation, the dates on which services were rendered or the services performed. In Re LTV Securities Litigation, 89 F.R.D. 595 (N.D. Tex. 1981).

And even when a statement is entitled to attorney-client privilege, a court may set aside that privilege when it appears that the communication involves the commission of a crime or fraud.

> The importance and sanctity of the attorney-client privilege is well established.  Yet, the privilege is not worthy of protection "at all costs" as Intervenor suggests.  Because it withholds relevant information from the factfinder, the attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud.  It is the purpose of the crime-fraud exception to the attorney client privilege to assure that the seal of secrecy, between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.

In re Grand Jury Subpoenas (Roe), 144 F.3d 653, 659-60 (10th Cir. 1998) (internal punctuation and citations omitted).

The party opposing the privilege on grounds of the crime-fraud exception must present *prima facie* evidence that the attorney's participation in the crime or fraud has some foundation in fact. Motley v. Marathon Oil Co., *supra*, at 1551.

## Application to This Case

None of the documents submitted for *in camera* inspection in this case falls within the classic definition of an attorney-client communication.  The letters and emails submitted are not between lead American counsel Steven Donziger ("Donziger") and his clients, the Ecuadorian Plaintiffs;

3

rather, they consist for the most part of communications between attorney Donziger and the Respondents, who were hired by Donziger in connection with his representation of the Ecuadorian Plaintiffs. Kamp and E-Tech were paid to provide scientific services which would enable Donziger to establish the extent of contamination allegedly caused by Chevron's oil exploration activities in Ecuador, and to help establish the amount of damages in the case.

The Tenth Circuit, along with a number of other courts, adheres to the rule that "[a] communication by an attorney to a third party or a communication by a third party to an attorney cannot be invoked as privileged." In re Grand Jury Proceedings, – F.3d –, 2010 WL 3258616, at *8 (10th Cir. Aug. 18, 2010).

While this approach is not universally followed, many courts agree with the Tenth Circuit. See, e.g.:

United States Postal Serv. v. Phelps Dodge Ref. Corp., 852 F. Supp. 156, 162 (E.D.N.Y. 1994) (outside scientific consultants hired to conduct environmental studies of soil and to oversee remedial work on property are not attorney's agents for purposes of the attorney client privilege; the court noted that while the privilege may cover communications made to agents of an attorney hired to assist in the rendition of legal services, "[t]here are few, if any, conceivable circumstances where a scientist or engineer employed to gather data should be considered an agent within the scope of the privilege since the information collected will generally be factual, obtained from sources other than the client");

Occidental Chem. Corp. v. OHM Remediation Servs. Corp., 175 F.R.D. 431 (W.D.N.Y. 1997) (communications between attorney, and employees of engineering firm hired by client to design remediation plan for cleanup of a hazardous waste disposal site, are not protected by attorney-client privilege; the engineers' job was not to put information gained from client into usable

4

form for the attorneys to render legal advice, but rather to collect information not obtainable directly from the client);

Louisiana Mun. Police Employees Ret. Sys. v. Sealed Air Corp., 253 F.R.D. 300, 312 (D.N.J. 2008) (party requesting "a derivative extension of the attorney-client privilege" to expert investment bankers hired by the party failed to meet its burden of showing that the attorney was relying on the experts "to translate or interpret information given to the lawyer by the client" rather than to simply give the attorney information he did not otherwise have);

Urban Box Office Network, Inc. v. Interfase Managers, L.P., No. 01 Civ. 8854 (LTS)(THK), 2006 WL 1004472 (S.D.N.Y. 2006) (letters and e-mails between counsel and a financial advisor for the client are not protected by attorney-client privilege where counsel was neither asked for nor imparted any legal advice);

United States v. Ackert, 169 F.3d 136 (2d Cir. 1999) (communications between an attorney and an outside investment banker who supplied information to the attorney are not shielded by attorney-client privilege, because the expert was not sought to translate or interpret information given to the attorney by the client);

In this case, Respondents Kamp and E-Tech were hired to conduct field research and provide scientific and technical advice in connection with the Ecuadorian Plaintiffs' lawsuit. They were not hired to translate or interpret information given to Donziger by his clients, but instead to gather factual data which was obtained from sources other than the clients and to give the attorney information he otherwise would not have had. Thus, the communications between Donziger and the Respondents constitute third-party communications which, under Tenth Circuit precedent, are not protected by the attorney-client privilege. In re Grand Jury Proceedings, *supra*.

Even if these communications were not exempt from protection as third-party

communications, Respondents' contention that attorney-client privilege protects them from disclosure would fail for other reasons.

Several of the documents submitted for the Court's *in camera* inspection, specifically, the attachments to <u>Bates</u> document No. NM00000144 (hereinafter referred to the format, "<u>Bates</u> No. 00144"), are not attorney-client privileged documents. These documents consist of credit card billing statements, invoices and receipts submitted to E-Tech by William E. Powers, Powers Engineering, and Globally Green Consulting. These are not communications between a client and the attorney, and to the extent an attorney was required to approve the billing statements, the underlying charges were disclosed to third parties, vendors, hotels, cab drivers, rental car companies, etc. These are not the kind of communications entitled to attorney-client privilege.

<u>Bates</u> stamped documents Nos. 00265-00266, 00291-00292, 01329-01332, 01684-01691, and 00267-00271 consist of letters and e-mail communications between Donziger and Respondents Kamp and E-Tech. Thus, to the extent these documents consist of Donziger's attempts to enter into a professional contract with E-Tech, they are not subject to attorney-client privilege any more so than would an attorney's fee arrangements with a client or an expert witness. <u>In re Grand Jury Subpoenas (Anderson)</u>, *supra*, at 1492.

Also Included in Respondents' submissions are communications, <u>Bates</u> Nos. 01684-01691 and 01293-01294, which memorialize attempts by E-Tech employees to clarify the scope of the proposed retention agreement and seek to determine exactly what services Donziger wants E-Tech to perform. While the submitted documents are not a complete chronicle of the parties' interactions, it is clear that at some point E-Tech was hired by Donziger, as there are statements for services performed and follow-up letters concerning E-Tech's dissatisfaction with payments – that is, E-tech's complaints that Donziger failed to perform in accord with the parties' agreement.

These e-mails refer to facts, sequences, and what services were expected and may have been performed.  They do not fall within the classification of confidential communications between an attorney and client, and the Court declines to afford them status as attorney-client protected.

The series of e-mails at <u>Bates</u> Nos. 01684-01691 appear highly relevant to the proposed discovery.  These e-mails were apparently exchanged prior to the time a contractual agreement was entered into between Donziger and E-Tech.  At one point, Donziger tells E-Tech that much of the work and studies had already been performed by an individual, Charles Champs,[2] whose name will not appear on the report emanating from the studies.  Donziger tells E-Tech and Kamp that their only responsibility will be to give the report their "blessing," apparently asking them to pass the Champ report off as E-Tech's own work:

> [Donziger:] we have the cost assessment done.  you just need to bless it my good friend and bless the other work . . . .  we need u and ann for that.  plus to review and critique the cost assessment.  and to support fausto and the locals.  and to keep me sane.  and to protect us when texaco drops the h-bomb on the results . . . ."

[<u>Bates</u> No. 01688].

E-Tech employee Mark Quarles ("Quarles") responds, asking exactly what E-Tech is being asked to "bless," and since E-Tech knows nothing about the individual whose report it is being asked to adopt, he asks for biographical information and credentials of the author, and asks to see the report itself. [<u>Bates</u> Nos. 01686-01687].  Donziger responds that a draft report will be sent, and that it had not yet been determined whether Champ's name will appear on the report.  Donziger further tells E-Tech that the scope of work previously discussed, including site evaluations and well testing, will not be necessary as Champ already conducted evaluations. [<u>Bates</u> Nos. 01685-01686].

---

[2]"Champs" is identified at other points in the record as "Champ."

At one point, Donziger directs Quarles as follows: "let's make it happen.  don't be so schematic.

[After all,] "this is ecuador" [Bates No. 01688].

> Donziger explains to Quarles:

>> The idea is to back up and protect the work of the perito [Cabrera], who has yet to be apptd by the court.  The Champs report is part of that.  That report is in draft form . . . .  This process is fluid – it is not a matter of signing off on someone else's report as much as it is getting involved in developing the work with the perito consistent with our severe limitations in terms of money, and then signing off at the end if you can.

[Bates No. 01686].

> When Quarles questions how they can bless Champ's report without site visits, Donziger

makes clear it is the lawyer who will decide.

>> [Quarles:] what field investigations are pending?  Are we relying solely on past reports?  No detailed Peritaje Global, detailed site sampling?
>> [Donziger:] OPEN TO RESOLUTION, BUT LIMITED SITE SAMPLING, PERHAPS SOME IN DETAIL, BUT NOT AT LEVEL OF DETAIL WE HAD DISCUSSED BUT WE ARE STILL WORKING THROUGH IT AND U SHOULD BE A PART OF IT. BUT THE LAWYERS WILL CONTROL THE SCOPE, NOT THE SCIENCE PEOPLE . . . .

[Bates Nos. 01686-01687].

> At one point in the e-mail exchange, Donziger tells Quarles that he does not have to sign off

on the work if he is not comfortable with it.  [Bates No. 01686].  However, the overall import of

Dongizer's statements to E-Tech in this exchange is to the contrary, and Donziger makes this

statement only after extensive questioning by Quarles as to the nature and scope of the work

expected of E-Tech.  It comes after Quarles's unconditional statement that he would not be willing

to certify a report of work that he had not performed or supervised, "for any cost."  [Bates No.

01688].  E-Tech's correspondence to Donziger, dated September 1, 2006, also contains some of E-

Tech's instruction on what appears to be a payment ruse:

> In addition to allowing access to lower rates, working through E-Tech would continue to allow Kohn, Swift and Graf to make payments to E-Tech in the form of a public donation, as past correspondence with the firm has indicated. Please confirm that monies paid to E-Tech are public donations as opposed to private payments so that we can file accordingly with the IRS.

[Bates No. 01330].

A February 16, 2007 e-mail from Kamp to himself appears to consist of his notes following a telephone conference with Donziger. Kamp writes: "wants to send strong message to chevron and country case will end soon....  very fast track to get out of judge....  we will do some field work me pablo fauto and luis...  judge appoints expert...who ideally works with our team . . . ." [Bates No. 00267].

Other documents submitted for the *in camera* review indicate that E-Tech was aware that its report, even if it is simply an approval or a "blessing" of the Champ report, would be submitted as part of the Cabrera report being prepared for filing in the Ecuadorian court. [Bates No. 01686].

As noted in the Court's earlier order to produce, Applicants discovered evidence demonstrating that Respondents, and particularly Respondents' attorneys, may have fabricated evidence, may have engaged in improper contact with the Ecuadorian judge in an effort to have their own proposed expert, Richard Cabrera Vega, appointed, and that the report submitted may not have been prepared by Cabrera at all but by Plaintiffs' counsel and Plaintiffs' consultants, and was simply signed off by the purportedly neutral expert, Cabrera.

The documents submitted to the Court for an *in camera* inspection support these allegations. It is abundantly clear that attorney Donziger is retaining E-Tech as an expert basically to adopt the analysis and findings of some other individual, an individual E-Tech does not even know and whose

9

work it has never seen.

The documents further support the contention that Cabrera's report, which includes conclusions regarding widespread ground contamination, was not based on E-Tech's own evaluations. To the contrary, as noted in the Court's earlier Memorandum, a lunch meeting occurred in Ecuador at which E-Tech and, indeed, Champ tell Donziger that there is no evidence of extensive ground-water contamination and that the only contamination found and recorded in the various reports referred to are limited to the pits or well site. It is in that meeting that Donziger dismisses the concerns of lack of contamination evidence, and suggests that since there is evidence of contamination at specific well sites or pits, that evidence can be "extrapolated" and applied to areas where no site investigations were either performed or where no evidence of contamination was found.

A final document of significant interest is an e-mail from Donziger to Bill Powers of Powers Engineering; Ann Maest, E-Tech's chief scientist; Quarles; and Kamp. It is about an "important Ecuador development" and contains a news release concerning the Ecuadorian government's accusation that Texaco (predecessor to Chevron in the oil operation in Ecuador) engaged in fraud in reference to the prior settlement and release of environmental claims. Donziger writes:

> The Attorney General of Ecuador is now suing Chevron for fraud on the remediation!! We have been pushing this for over a year, we finally did it !!! This huge, huge. Chevron has totally lost the state of Ecuador as an ally – this has never happened before. Should help us hugely.

[Bates No. 01732].

## Conclusion

In sum, the Court finds, first, that the documents submitted for *in camera* inspection do not fall within the definition of attorney-client communications, but rather consist of communications

10

between an attorney and scientific consultants which are not protected by attorney-client privilege.

Even if this were not so, the first portion of documents, <u>Bates</u> No. 00144 and attachments thereto, are not attorney-client privilege save for the letter of transmittal, and the letter of transmittal does not appear to be the kind of document intended to constitute a confidential communication. As <u>Bates</u> No. 00144 and attachments are not attorney-client privileged, they should be produced.

Next, the e-mails relating to Donziger's efforts to negotiate a contract, define the scope of work and agree on prices, or E-Tech's e-mail communications seeking clarification of the scope of the work, asking for payment, or asking questions relating to what E-Tech is expected to do, all fall within the negotiations for the creation of a retention agreement. Such agreements are not confidential, as they constitute facts.

Additionally, exchanges between the Donziger and E-Tech indicate that Plaintiff's attorney was expecting E-Tech to give its "blessing" to work performed by an individual, at that time undisclosed, and to have E-Tech present the work apparently as its own. The exchanges also include information on how E-Tech's work will find its way into the court-appointed expert's report. The e-mail communications indicate concern from E-Tech in doing this, and E-Tech asks for clarification concerning exactly what Donziger wants it to do. The Court concludes that these discussions trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the preparation of the purported expert reports by the attorneys and their consultants.

The documents also touch on Donziger's and presumably others' efforts to pressure the Ecuadorian government to prosecute Chevron's personnel, a task "[w]e have been pushing . . . for . . . [and] finally did," because the prosecutions "[s]hould help us hugely."

The Court notes that, in their Objections [Doc. 84] to the Court's earlier ruling, Respondents

argue that the crime-fraud exception to work product protection, as well as attorney-client privilege, is inappropriate in this case in that there has been no *prima facie* showing that any conduct by the parties constituted a fraud under Ecuadorian laws.  In addition, Respondents refer to Chevron's "misleading use of effectively a few minutes of outtakes from the documentary Crude." [Doc. 84, at 36 & n.12].

The undersigned viewed those outtakes [Doc. 13, Ex. A]. and finds that they are sufficient to establish a *prima facie* case of attempted fraudulent activity by attorney Donziger, including directing Respondents to "extrapolate" scientific evidence that does not exist, and having a purportedly neutral expert sign his name to a report that was actually prepared by Plaintiffs' attorneys and experts without Chevron's knowledge.  The suggestion that E-Tech was simply to adopt as its own and give its blessing to the work product of someone E-Tech did not know, whose credentials were unknown and whose report had not been read is also startling, unethical, unprofessional and perhaps illegal.  If these outtakes are misleading, as Respondents' counsel asserts, no one has put them in a different context for the Court.  They are, at least, *prima facie* evidence of corruption of the judicial process and fraud on the Ecuadorian court.  Indeed, the best way to put the outtakes in context is to have the Respondents, who were present at the meetings filmed in Ecuador, testify at depositions and produce all documents relevant to the issues at stake in this litigation.

Respondents argue that the attorney's conduct, as evidenced by the outtakes and the e-mails submitted for this *in camera* inspection, must be judged against the standards of the Ecuadorian judicial system.  Respondents have not shown that Ecuadorian courts would knowingly countenance evidence submitted in the guise of a neutral expert report when the report was actually prepared by one party to the litigation, or would permit a party to invent, exaggerate or "extrapolate" evidence

that doesn't exist and award billions of dollars of damages based on that evidence. As another court

noted recently:

> While this court is unfamiliar with the practices of the Ecuadorian
> judicial system, the court must believe that the concept of fraud is
> universal, and that what has blatantly occurred in this matter would
> in fact be considered fraud by any court. If such conduct does not
> amount to fraud in a particular country, then that country has larger
> problems than an oil spill.

Chevron v. Camp, No. 10mc27, slip op. at 12 (W.D.N.C. Aug. 30, 2010) [Doc. 73, Ex. A].

The Court accordingly rejects Respondents' claims of attorney-client privilege and, upon the

lifting of the stay [see Doc. 81], orders that all of the documents be immediately produced. This

order of production, however, is premised on the trial court's affirmation of the Magistrate Judge's

earlier discovery order.

IT IS SO ORDERED.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge